**F I L E D**
CLERK, U.S. DISTRICT COURT

12/1/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

April 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>OGANES DOGANYAN,<br>     aka "Hovik Doganyan,"<br>     aka "John Doganyan," and<br>KRISTINE ARUTYUNYAN,<br><br>          Defendants. | CR  2:21-CR-00548-GW<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 371: Conspiracy; 42 U.S.C. § 1320a-7b(b)(2)(A): Illegal Remunerations for Health Care Referrals; 18 U.S.C. § 982(a)(7): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Burbank Hospice Care Services, Inc. ("Burbank Hospice") was a hospice clinic located at 16909 Parthenia Street, Suite 103, Northridge, California.

2.    Community Hospice Care, LLC ("Community Hospice") was a hospice clinic located at 16909 Parthenia Street, Suite 103B, Northridge, California.

3.    Platinum Home Health Care, Inc. ("Platinum Care") was a home health clinic located at 16909 Parthenia Street, Suite 104B, Northridge, California.

4.    Defendant OGANES DOGANYAN, also known as "John Doganyan" and "Hovik Doganyan," was a resident of Northridge, California.

5.    Defendant KRISTINE ARUTYUNYAN was a resident of Glendale, California.

6.    Defendants DOGANYAN and ARUTYUNYAN obtained Medicare patients to be billed for purported hospice services by Burbank Hospice and Community Hospice.

7.    Physician 1 was a medical professional licensed to practice in California.  In exchange for kickback payments from defendants DOGANYAN and ARUTYUNYAN, Physician 1 provided information regarding purported Medicare patients ("fictitious Medicare beneficiaries") to defendants DOGANYAN and ARUTYUNYAN to be billed by Burbank Hospice and Community Hospice.

Medicare

8.    Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "Federal health care program" as referenced in Title 42, United States Code, Section 1320a-7b(b),

and a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

9. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number ("HICN").

10. Hospices, home health agencies, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare were referred to as Medicare "providers."

11. To participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency. After obtaining the applicable license, Medicare required prospective hospice and home health providers to submit an application in which the prospective provider agreed to: (a) comply with all Medicare-related laws and regulations, including the Federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)), which prohibits the offering, paying, soliciting, or receiving of any remuneration in exchange for a patient referral or referral of business for which payment may be made by any Federal health care program; and (b) not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for the processing and payment of claims submitted by the providers.

12.   A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

13.   Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that: (a) they were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) they would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) they would submit claims that were accurate, complete, and truthful.

14.   A Medicare claim for payment was required to set forth, among other things, the following:  the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI") of the physician who prescribed or ordered the services.

Hospice Services

15.   Medicare coverage for hospice services was limited to situations in which: (1) the beneficiary's attending physician and the hospice medical director certified in writing that the beneficiary was terminally ill and had six months or less to live if the beneficiary's illness ran its normal course; and (2) the beneficiary signed an election form statement choosing hospice care instead of other Medicare benefits. Hospice services reimbursed by Medicare were palliative in nature and included, but were not limited to, medications to

manage pain symptoms, necessary medical equipment, and
bereavement services to surviving family members.  Once a
beneficiary chose hospice care, Medicare would not cover
treatment intended to cure the beneficiary's terminal illness.
The beneficiary had to sign and date an election form
documenting this choice.  The election form had to include an
acknowledgement that the beneficiary had been given a full
understanding of hospice care, particularly the palliative
rather than curative nature of treatment, and an acknowledgement
that the beneficiary understood that certain Medicare services
were waived by the election.

    16.  If the beneficiary had a primary care physician
("PCP"), Medicare required the PCP and a physician at a hospice
to certify in writing that the beneficiary was terminally ill
with a life expectancy of six months or less, if the terminal
illness ran its normal course.

    17.  Medicare was divided into different program "parts":
Part A, Part B, Part C, and Part D.  Medicare covered hospice
services for those beneficiaries who were eligible for Medicare
Part A (hospital-related services).  When a Medicare beneficiary
elected hospice coverage, the beneficiary waived all rights to
Medicare Part B (outpatient physician services and procedures)
coverage of services to treat or reverse the beneficiary's
terminal illness while the beneficiary was on hospice.

    18.  A beneficiary could elect to receive hospice benefits
for two periods of 90 days and, thereafter, additional service
for periods of 60 days per period.

19.  For the beneficiary to continue to receive hospice benefits after the second 90-day period, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinical findings or other documentation supporting the diagnosis of terminal illness.  For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before signing a certification of terminal illness.

<u>Home Health Care Services</u>

20.  Home health care was supportive health care that was provided to patients in their homes.  Home health care was prescribed by a treating physician to a patient if the patient had developed an illness or injury that required skilled care, but not at the level provided by an acute facility such as a hospital or at a residential skilled nursing facility.  Home health services might include changing wound dressings, giving injections, or teaching a patient's family member to properly care for a patient recently discharged from the hospital.

21.  To qualify for the Medicare home health benefit, a beneficiary must: (1) have been confined to his or her home; (2) have been under the care of a physician; (3) have received services under a CMS Form 485 Home Health Certification and Plan of Care ("485") established and periodically reviewed by a physician; (4) have had a face-to-face encounter with a physician or approved provider within a specified period of time from the start of home health care; and (5) need skilled nursing care on an intermittent basis, physical therapy, speech-language pathology, or have a continuing need for occupational therapy.

22.   A patient was considered to be confined to his or her home ("homebound") if the patient met two criteria: (1) the patient was generally unable to leave home, such that leaving home required a considerable and taxing effort; and (2) the patient must either, (i) because of illness or injury, have needed the aid of supportive devices such as a cane, walker, wheelchair, or the use of special transportation, or required the assistance of another person in order to leave his or her residence, or (ii) had a condition such that leaving his or her home was medically contraindicated.

23.   Prior to the start of care, a physician, registered nurse, or qualified therapist must have completed an assessment of the patient, using the Outcome and Assessment Information Set ("OASIS") created by CMS.  The OASIS was a comprehensive assessment designed to collect information on a home health care recipient's clinical status, functional status, and service needs.  Part of the OASIS assessment included a rating of the patient's ability to conduct certain Activities of Daily Living ("ADLs"), such as grooming, dressing, bathing, toileting, walking, and feeding himself or herself.  The information gathered during the assessment was then used to create the 485 for that patient.  A 485 had to indicate the type of services to be provided to the patient, both with respect to the professional who would provide them and the nature of the individual services, as well as the frequency of the services.

24.   The services that an HHA provided to the patient were based upon the 485, which must have been reviewed and signed by a physician.  The 485 must have been reviewed and signed by the

physician who established the 485, in consultation with the
HHA's professional personnel, at least every 60 days.  CMS
permitted continuous 60-day episodes of home health care for
beneficiaries who continued to be eligible for home health
benefits.  The physician's signature on a 485 for the first
episode of home health care at a HHA was frequently called a
"certification" to receive home health care, while signatures on
485 for subsequent episodes of home health care were called
"recertifications."

B.    THE OBJECT OF THE CONSPIRACY

      25.  Beginning no later than in or around December 2020,
and continuing to at least in or around June 2021, in Los
Angeles County, within the Central District of California, and
elsewhere, defendants DOGANYAN and ARUTYUNYAN knowingly
conspired with each other and others known and unknown to the
Grand Jury to commit health care fraud, in violation of Title
18, United States Code, Section 1347.

C.    THE MANNER AND MEANS OF THE CONSPIRACY

      26.  The object of the conspiracy was carried out, and to
be carried out, in substance as follows:

            a.    Defendants DOGANYAN and ARUTYUNYAN would develop
relationships with sources of Medicare beneficiary referrals,
including Physician 1.

            b.    Defendants DOGANYAN and ARUTYUNYAN, along with
others known and unknown to the Grand Jury, would offer to pay
and would pay kickbacks in the form of cash to patient
recruiters, including Physician 1, for the referral of Medicare
beneficiaries to Burbank Hospice and Community Hospice for

hospice services and to Platinum Care for home health services, both of which services would then be billed to Medicare.

c.   In exchange for the referral of Medicare beneficiaries that could be billed for purported hospice services, defendants DOGANYAN and ARUTYUNYAN would offer to pay and would pay Physician 1 kickbacks for each Medicare beneficiary referred, amounting to approximately $2,000 for the first month and approximately $500 for every month thereafter that the referred beneficiary remained on hospice services at Burbank Hospice or Community Hospice, even if the patient did not qualify for hospice services.

d.   As defendants DOGANYAN and ARUTYUNYAN knew and intended, Burbank Hospice and Community Hospice would not provide any actual hospice services to the patients referred by Physician 1.

e.   In exchange for the referral of Medicare beneficiaries for purported home health services, defendants DOGANYAN and ARUTYUNYAN would offer to pay kickbacks of approximately $1,500 to Physician 1 for each Medicare beneficiary.

f.   Defendants DOGANYAN and ARUTYUNYAN would falsify, alter, and cause others to falsify and alter medical records to support false and fraudulent claims for hospice services to Medicare on behalf of Burbank Hospice and Community Hospice.

g.   Defendants DOGANYAN and ARUTYUNYAN would use and cause others to use the names and HICNs of Medicare beneficiaries, including but not limited to those referred by Physician 1, to submit and cause to be submitted false and

fraudulent claims to Medicare from Burbank Hospice and Community Hospice for hospice services purportedly rendered to Medicare beneficiaries.  In fact, as defendants DOGANYAN and ARUTYUNYAN well knew, the alleged hospice services had not been rendered and were not medically necessary, and the referrals for those services had been procured through the payment of illegal kickbacks.

h.   As a result of the submission of these false and fraudulent claims, Medicare would make payments to Burbank Hospice and Community hospice.

COUNTS TWO THROUGH NINE

[18 U.S.C. §§ 1347, 2]

27.  The Grand Jury repeats paragraphs 1 through 24 and 26 of this Indictment here.

A.  THE SCHEME TO DEFRAUD

28.  Beginning no later than in or around December 2020, and continuing to at least in or around June 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants DOGANYAN and ARUTYUNYAN, together with others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly, willfully, and with intent to defraud, executed and willfully caused to be executed a scheme and artifice: (a) to defraud Medicare, a health care benefit program, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare, a health care benefit program, by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

B.  MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

29.  The fraudulent scheme operated, in substance, as described in paragraph 26 of this Indictment.

C.  EXECUTIONS OF THE FRAUDULENT SCHEME

30.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants DOGANYAN and ARUTYUNYAN, together with others known and unknown to the Grand Jury, each aiding and

1   abetting the others, knowingly and willfully executed and

2   willfully caused the execution of the fraudulent scheme

3   described above by submitting and causing to be submitted to

4   Medicare the following false and fraudulent claims for payment

5   of purported hospice services that were in fact not rendered and

6   not medically necessary, as the patients were, in fact,

7   fictitious beneficiaries, and where the referrals for those

8   services were procured through the payment of illegal kickbacks:

| COUNT | FICTITIOUS MEDICARE BENEFICIARY | CLAIM NUMBER | DATE SUBMITTED | APPROX. AMOUNT BILLED |
|---|---|---|---|---|
| TWO | D.B. | 22112400998207CAR | 5/4/2021 | $8,057.42 |
| THREE | A.G. | 22112401001307CAR | 5/4/2021 | $8,247.42 |
| FOUR | J.A. | 22112500858707CAR | 5/5/2021 | $3,463.76 |
| FIVE | C.M. | 22112500861207CAR | 5/5/2021 | $3,463.76 |
| SIX | M.P. | 22115300738207CAR | 6/2/2021 | $5,337.62 |
| SEVEN | S.M. | 22115300737807CAR | 6/2/2021 | $5,227.62 |
| EIGHT | J.W. | 22115400645307CAR | 6/3/2021 | $1,839.90 |
| NINE | J.R. | 22115400642807CAR | 6/3/2021 | $1,769.90 |

COUNT TEN

[18 U.S.C. § 371]

31.  The Grand Jury repeats paragraphs 1 through 24, 26, and 30 of this Indictment here.

A.   OBJECT OF THE CONSPIRACY

32.  Beginning no later than in or around December 2020, and continuing to at least in or around June 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants DOGANYAN and ARUTYUNYAN knowingly conspired with each other and others known and unknown to the Grand Jury to commit an offense against the United States, namely, knowingly and willfully offering and paying any remuneration to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

B.   THE MANNER AND MEANS OF THE CONSPIRACY

33.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.   Beginning no later than in or around December 2020, defendants DOGANYAN and ARUTYUNYAN, along with others known and unknown to the Grand Jury, would offer to pay and would pay kickbacks in the form of cash to patient recruiters, including Physician 1, for the referral of Medicare beneficiaries to Burbank Hospice and Community Hospice for

hospice services and to Platinum Care for home health care, both of which services would then be billed to Medicare.

    b.   In exchange for the referral of Medicare beneficiaries that could be billed for purported hospice services, defendants DOGANYAN and ARUTYUNYAN would offer to pay and pay kickbacks for each Medicare beneficiary referred, amounting to approximately $2,000 for the first month and approximately $500 for every month thereafter that the beneficiary remained on hospice services at Burbank Hospice or Community Hospice.

    c.   In exchange for the referral of Medicare beneficiaries that could be billed for purported home health care services, defendants DOGANYAN and ARUTYUNYAN would offer to pay kickbacks of approximately $1,500 for each Medicare beneficiary.

C.   OVERT ACTS

    34.   On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants DOGANYAN and ARUTYUNYAN, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:

    Overt Act No. 1:   On December 12, 2021, defendants DOGANYAN and ARUTYUNYAN offered to pay Physician 1 approximately $2,000 for each Medicare beneficiary Physician 1 referred for hospice services.

    Overt Act No. 2:   On December 12, 2021, defendants DOGANYAN and ARUTYUNYAN offered to pay Physician 1 approximately

$1,500 for each Medicare beneficiary Physician 1 referred for home health services.

Overt Act No. 3:   On April 19, 2021, defendants DOGANYAN and ARUTYUNYAN paid approximately $4,000 in cash to Physician 1 for the referral of purported Medicare beneficiaries D.B. and A.G., who were, in fact, fictitious Medicare beneficiaries, for hospice services.

Overt Act No. 4:   On April 26, 2021, defendants DOGANYAN and ARUTYUNYAN paid approximately $4,000 in cash to Physician 1 for the referral of purported Medicare beneficiaries C.M. and J.A., who were, in fact, fictitious Medicare beneficiaries, for hospice services.

Overt Act No. 5:   On May 11, 2021, defendants DOGANYAN and ARUTYUNYAN paid approximately $1,000 in cash to Physician 1 for the monthly renewal fee for the referral of purported Medicare beneficiaries D.B. and A.G., who were, in fact, fictitious Medicare beneficiaries, for hospice services.

Overt Act No. 6:   On May 26, 2021, defendants DOGANYAN and ARUTYUNYAN paid approximately $5,000 in cash to Physician 1, comprised of approximately $4,000 for the referral of purported Medicare beneficiaries M.P. and S.M., who were, in fact, fictitious Medicare beneficiaries, for hospice services and approximately $1,000 for the monthly renewal fee for the referral of purported Medicare beneficiaries C.M. and J.A., who were, in fact, fictitious Medicare beneficiaries.

Overt Act No. 7:   On June 23, 2021, defendants DOGANYAN and ARUTYUNYAN paid approximately $4,000 in cash to Physician 1 for the referral of purported Medicare beneficiaries J.R. and

J.W., who were, in fact, fictitious Medicare beneficiaries, for hospice services.

COUNTS ELEVEN THROUGH FIFTEEN

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2]

35.   The Grand Jury repeats paragraphs 1 through 24, 26, 30, 33, and 34 of this Indictment here.

36.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants DOGANYAN and ARUTYUNYAN, together with others known and unknown to the Grand Jury, aiding and abetting one another, knowingly and willfully offered to pay and paid, and caused to be paid, remuneration, namely, cash, in the approximate amounts set forth below, to Physician 1, which constituted kickbacks for referring Medicare beneficiaries to Burbank Hospice and Community Hospice for hospice services, for which payments could be made in whole and in part under a Federal health care program, namely, Medicare.

| COUNT | DATE | APPROX. AMOUNT |
|---|---|---|
| ELEVEN | 4/19/2021 | $4,000 |
| TWELVE | 4/26/2021 | $4,000 |
| THIRTEEN | 5/11/2021 | $1,000 |
| FOURTEEN | 5/26/2021 | $5,000 |
| FIFTEEN | 6/23/2021 | $4,000 |

FORFEITURE ALLEGATION

[18 U.S.C. § 982(a)(7)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(7), in the event of the conviction of defendant OGANES DOGANYAN, also known as "John Doganyan" and "Hovik Doganyan," and/or defendant KRISTINE ARUTYUNYAN under any of Counts One through Fifteen of this Indictment.

2.   Either defendant so convicted shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), either defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has

1   been placed beyond the jurisdiction of the Court; (d) has been

2   substantially diminished in value; or (e) has been commingled

3   with other property that cannot be divided without difficulty.

4

5                                       A TRUE BILL

6

7                                       ___/S/_____

8                                       Foreperson

9

10  TRACY L. WILKISON
    United States Attorney

11

12  SCOTT M. GARRINGER
    Assistant United States Attorney
13  Chief, Criminal Division

14  RANEE A. KATZENSTEIN
    Assistant United States Attorney
15  Chief, Major Frauds Section

16  JOSEPH S. BEEMSTERBOER
    Acting Chief, Fraud Section
17  U.S. Department of Justice

18  ALLAN MEDINA
    Deputy Chief, Fraud Section
19  United States Department of Justice

20  NIALL M. O'DONNELL
    Assistant Chief, Fraud Section
21  United States Department of Justice

22  JUSTIN P. GIVENS
    Trial Attorney, Fraud Section
23  United States Department of Justice

24

25

26

27

28